IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :
                                  :    CRIMINAL ACTION
                                  :    NO. 21-216
                                  :
          v.                      :
                                  :
WARREN MCALILEY                   :
                                  :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        March 14, 2022

## I. INTRODUCTION

On May 26, 2021, the Grand Jury returned an indictment charging Defendant with: possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(e) (Count 1); possession with intent to distribute 400 grams or more of fentanyl, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Count 2); carrying and using a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) (Count 3). On August 3, after a superseding indictment, the Grand Jury charged Defendant with two additional counts: importation and use of mail to transport drug paraphernalia, in violation of 28 U.S.C. § 863(a)(2), (a)(3), and aiding and abetting in violation of 18 U.S.C. § 2 (Count 4); and attempt to manufacture controlled substances, in violation of 21 U.S.C. § 846 (Count 5). On September 29, 2021, after a

second superseding indictment, the Grand Jury charged defendant
with an additional count: importation of merchandise contrary to
law in violation of 18 U.S.C. § 545 (Count 6).

Before this Court is Defendant's motion to suppress and
exclude all physical evidence collected after Defendant was
detained on September 25, 2020.[1] This memorandum constitutes the
Court's findings of fact and conclusions of law with respect to
Defendant's motion. For the reasons set forth below, Defendant's
motion will be denied.

## II.   FINDINGS OF FACT

The Court held a suppression hearing on October 28, 2021.
Customs and Border Protection ("CBP") Officer Michael Hughes,
forensic chemist Shelby Stotelmyer, CBP Officer Paul Smith, CBP
Officer Michael Cardo, Department of Homeland Security
Investigations ("HSI") Special Agent Michael Johnson, HSI
Special Agent Joseph Consavage, Pennsylvania State Trooper James
Nolan, Pennsylvania State Trooper Michael Vaccaro, Pennsylvania
State Trooper Javier Garcia, and Pennsylvania State Trooper Cody
Simcox testified in this case. The Court finds their testimony
credible and accepts it as fact.

---

[1]     The parties rely on their initial briefings, as well as the
proposed findings of fact and conclusions of law the parties
submitted following the suppression hearing held on October 28,
2021.

On September 15, 2020, officers with the CBP at Memphis International Airport intercepted a package being transported by FedEx that originated from Shaanxi Province, China. The shipper was "Xi'an Ze Bang, Biotech, Co., Ltd." and the package was destined for the following address: "Justin Sellers, 1319 West Jerome Street, Philadelphia, PA." CBP officers are tasked with determining whether any merchandise shipments are out of the ordinary. For example, CBP officers will look for products labeled as "silicon dioxide." Silicon dioxide is a sand-type product that one could obtain from the United States, so, according to CPB Officer Hughes, it is a red flag if an international package is labelled with "silicon dioxide." Additionally, according to CBP Officer Smith, "silicon dioxide" is a commonly used as a false label.

The CBP Officers deemed the package suspicious as it was passing through the Memphis International Airport FedEx Hub because: (1) The shipper had prior shipments seized by CBP for customs violations, (2) the package was labeled as "silicon dioxide," and (3) the "silicon dioxide" was being sent to a residential address, rather than a company.[2]

CBP Officer Smith searched the package and found a white powder. CBP officers sent the package to satellite laboratory

---

[2]   Defendant does not challenge the search and seizure of the package in his motion.

for chemical testing, where forensic chemist Stotelmyer determined it to be over a kilogram of Xylazine. Xylazine is a potent horse tranquilizer, legally used by veterinarians as an animal sedative. Though Xylazine is not a controlled substance, according to CBP Officer Hughes, forensic chemist Stotelmyer, CBP Officer Smith, and CBP officer Cardo, it is frequently used as a drug adulterant/cutting agent and mixed with narcotics.[3] Tr: 238:5-12, ECF No. 41; see also Tr. 19:14-16 (CBP Officer Hughes testified that Xylazine was a cutting agent); Tr. 31:21-25; 32:1-3 (forensic chemist Stotelmyer notes Xylazine is a cutting agent); Tr. 46:14-16 (Officer Smith noted its protocol to seize an adulterant like Xylazine); Tr. 57:10-11 (noting Xylazine is considered a drug adulterant). The Food and Drug Administrative (the "FDA") has approved Xylazine for veterinarian use only. See 21 C.F.R. § 522.2662(c). Forensic chemist Stotelmyer confirmed that Xylazine is only approved for veterinarian use.

The CBP officers reported the package to the Department of Homeland Security Investigations. HSI agents, believing that the intended recipient sought to mix the Xylazine with narcotics, enlisted the help of the Pennsylvania State Police ("PSP") to enact a "controlled delivery" of the package. HSI agents

---

[3]    The Government notes that "[a]lthough Xylazine is not a controlled substance, it is a federal crime to mislabel or misbrand imported goods or packages, see 18 U.S.C. §§ 542, 545, 21 U.S.C. § 331." Gov. Resp. at 4, ECF No. 32.

coordinated with the PSP Eastern Interdiction Unit, a drug task force assigned responsibility for interdicting narcotics and drug paraphernalia imported into the state. Tr. at 132:24–133:10.

The HSI agents and PSP officers ruled out the possibility that the Xylazine was heading to a facility that specializes in animal medicine or animal-related products. The HSI agents and PSP officers determined that 1319 West Jerome Street is a private residence in Northeast Philadelphia. The HSI agents and PSP officers determined that "Justin Sellers" is a fake name and that individuals with the last name "McAliley" live at the 1319 West Jerome Street residence. Officer Vaccaro testified that drug dealers often use fictitious names and false labels in order to ship, receive, and transport drugs and drug paraphernalia. Tr. 197:11-21. According to the Government, based on the fictitious name, packaging, and destination of the Xylazine, investigators determined that the substance was likely intended for illegal drug trade. See Tr. 137:23-25; 138:1-16.

On September 25, 2020, HSI agents and PSP officers swapped the Xylazine for a replica substance and effectuated a "controlled delivery" of the package. An undercover postal inspector delivered the package to the front door of 1319 West Jerome Street. A few minutes later, a man believed to be the father of the Defendant brought the package into the home.

Undercover officers observed the residence by parking in front of the house and around the block. Officer Vaccaro parked a few doors down in close to the residence. Approximately 30 minutes later, at 12:10 p.m., Defendant drove to the 1319 West Jerome Street address in a Chevrolet Malibu and retrieved the package.

Undercover officers, including Officer Nolan, Officer Vaccaro, and Special Agent Consavage, then followed Defendant to a residence located at 1349 Kerbaugh Street, Philadelphia, Pennsylvania. Officers surveilled the area. Some time later, in the afternoon, Defendant left the 1349 Kerbaugh Street address and drove to a hair salon to pick up his girlfriend, Sharita Boykin. Undercover officers observed Defendant driving at a high rate of speed and making several abrupt turns, which the officers deemed to be "countersurveillance" tactic.

After Defendant picked up Ms. Boykin, the undercover officers observed Defendant re-enter the 1349 Kerbaugh Street residence. The officers continued to observe the address noting that the neighborhood was a high crime area based on background research as well as observations of individuals in the area under the influence of narcotics.

At approximately 4:00 p.m., officers observed Ms. Boykin leave the 1349 Kerbaugh Street residence and enter the driver's seat of the Chevrolet Malibu. Defendant then left the 1349 Kerbaugh Street residence and entered the passenger seat of the

vehicle. However, after several minutes, Defendant exited the vehicle and re-entered the 1349 Kerbaugh Street residence. Ms. Boykin, alone in the car, then slowly drove around the block. Officer Vaccaro testified that Ms. Boykin appeared to slow down and peer into his vehicle. Officer Vaccaaro believed that his position had been detected and requested another officer assume his position.

Ms. Boykin continued to drive the Chevrolet Malibu and eventually parked nearby at a local store. Undercover officers then noticed that Defendant had left the 1349 Kerbaugh Street residence through the back door with a black duffel bag in hand. Defendant then walked through an overgrown back alley and rejoined Ms. Boykin at her vehicle. Defendant re-entered the Chevrolet Malibu and Ms. Boykin drove away from the store. The officers testified that these appeared to be "countersurveillance" measures.

The undercover officers suspected Defendant was transporting controlled substances, or its instrumentalities, in the duffel bag. Following instructions from HSI and PSP, Cody Simcox, a PSP officer, created a "walled off stop"[4] in an attempt

---

[4]   A traffic stop is constitutional, even if pretextual, if it is supported by probable cause or reasonable suspicion. U.S. v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006) (citing Whren v. United States, 517 U.S. 806 (1996)).

to develop independent probable cause to search the Chevrolet
Malibu.[5] Officer Simcox pulled the vehicle over after observing
Ms. Boykin fail to use a turn signal and fail to completely stop
at a stop sign. At approximately 4:41 p.m., Officer Simcox
advised Ms. Boykin and Defendant of the reason for the stop,
asked both parties to exit the vehicle, and requested
identification. During the stop, Defendant identified himself as
the owner of the vehicle. Officer Simcox initially told
Defendant and Ms. Boykin that if they were otherwise in lawful
operation of the vehicle, he would let them off with a warning.
Officer Simcox did not intend on letting them go due to the
ongoing investigation.

Officer Simcox then spoke with Defendant. Defendant
indicated he lived on Jerome Street and claimed he was going to
pick up his son from school. Officer Simcox asked Defendant if
he had ever been in trouble with the law and Defendant responded
that he was arrested approximately 10-15 years ago for a firearm
related charge. Officer Simcox then spoke with Ms. Boykin who
claimed they were coming from their home on Kerbaugh Street.

Officer Simcox then ran Ms. Boykin and Defendant's licenses
through a PSP database and discovered that Defendant had

---

[5]     Though Officer Simcox believed the investigation had enough
probable cause to stop the car, Officer Simcox and the other
officers believed Officer Simcox should develop independent
probable cause to stop Defendant.

multiple recent arrests for narcotics and thefts. Officer Simcox then went back over to Defendant's car and noticed he was on the phone. Officer Simcox requested he hang up the phone. Officer Simcox questioned Defendant stating, "I asked if you've ever been arrested and you just said 'firearms offenses.' You got thefts, you got unauthorized use, you got, you got drug charges . . ." Tr. Ex. 14 (Dash Camera Video) at 6:52-6:59. Defendant admitted his prior arrests involved drugs and firearms, but claimed he did not have any firearms or narcotics in the car. Officer Simcox then told Defendant that he was performing an investigation and Defendant and Ms. Boykin were being legally detained. Officer Simcox told Defendant that he was going to order a canine unit to sniff the car. Defendant and Ms. Boykin informed the officer that they were trying to pick up their son from school.

At 4:49 p.m., eight minutes into the stop, Officer Simcox and another PSP officer ordered a canine unit to the scene. Officer Simcox then questioned Defendant about his residence. Officer Simcox asked Defendant if he was living on Jerome Street and Defendant answered affirmatively. Defendant also indicated that they were coming from the Jerome Street residence. Officer Simcox then separately questioned Ms. Boykin who said that she is living on Kerbaugh Street and Defendant is living on Jerome Street; she told Officer Simcox that she left her home and

picked Defendant up on Kerbaugh Street so they could get Ms.
Boykin's son from school. As previously noted, the undercover
officers witnessed both Defendant and Ms. Boykin leave from the
Kerbaugh Street address. Officer Simcox testified that Defendant
appeared nervous throughout their interactions.

Officer Simcox then asked Ms. Boykin for consent to search
the vehicle. She declined, explaining that the vehicle belonged
to Defendant. Defendant also refused consent. Though the
officers believed there was probable cause to search the vehicle
even if the canine unit was unable to come, see Tr. 109:4-7;
175:11-18; 271;14-19, the officers waited on the canine unit to
obtain independent probable cause. The officers checked on their
request for a canine unit and were told that a canine unit was
not immediately available. Then PSP officers contacted the
Pennsylvania Police Department directly and the Department
eventually deployed a canine unit at approximately 5:25 p.m. The
officers decided it was best to wait for the canine unit, and,
believing there to be probable cause, agreed to hold Defendant
and Ms. Boykin indefinitely. The canine unit arrived at
approximately 6:18 p.m., 90 minutes after Defendant was
initially stopped.

After arriving, the canine unit identified controlled
substances in the vehicle. The officers searched the vehicle and
the black duffle bag recovering: (1) two kilograms of fentanyl,

(2) $61,380.00, (3) a Glock 27 with several magazines, (4) various packaging material, and (5) cellular phones. The officers then arrested Defendant and Ms. Boykin. PSP officers then obtained a search warrant for the 1349 Kerbaugh Street address and recovered drug paraphernalia including stamped baggies.

Defendant argues that the physical evidence obtained from Defendant's car and the 1349 Kerbaugh Street address should be suppressed as fruit of the poisonous tree because the stop was unconstitutional. Defendant specifically argues that though the officers arguably had probable cause for the initial traffic stop, once Defendant presented his license and registration, Officer Simcox completed the stop and Defendant should have been free to leave. Defendant maintains that there was no reasonable suspicion or probable cause that justified detaining Defendant for that length of time. Defendant argues that it was unconstitutional for the officers to search his vehicle. Defendant maintains that he and Ms. Boykin were going to pick up their son, Isa McAliley, and were late as a result. For support, Defendant provided a declaration from Tasha Rush, a teacher at Count on Me 123 Learning Center, where Isa McAliley is a student. Ms. Rush indicated that Defendant and Ms. Boykin were delayed in picking up Isa McAliley and Ms. Boykin let Ms. Rush know they had been pulled over by the police. In response, the

11

Government argues that the officers had probable cause to detain Defendant and to search his vehicle.

Defendant also argues that Defendant's statements at the stop should be suppressed. However, Defendant does not provide any argument or explanation to support this argument.[6] Accordingly, the Court will only consider whether the evidence the officers collected should be suppressed.

## III. LEGAL STANDARD

"[T]he Government bears the burden at a suppression hearing where . . . the search or seizure was conducted without a warrant. It must establish by a preponderance of the evidence when the seizure occurred and that it was then supported by

---

[6]    The Government contends that there are no grounds to exclude Defendant's statements because the detention was not a "custodial interrogation" implicating the Fourth Amendment.
    "No Miranda warning is required absent a 'custodial interrogation.'" U.S. v. Savage, 677 F. Supp. 2d 756, 763 (E.D. Pa. 2009). "A custodial interrogation exists if police initiate questioning, or its equivalent, after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. (first citing Thompson v. Keohane, 516 U.S. 99, 107 (1995), then citing Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)). Defendant was in custody as Officer Vaccaro confirmed he was legally detained. See Tr. 124:25-125:1; see also Savage, 677 F. Supp. at 763 (noting courts consider factors including "whether the officer[] told the suspect he was free to leave" and "the location or physical surroundings of the interrogation"). However, Defendant never specified which statements he contends should be suppressed and never argued that the officer's questioning would meet the legal definition of "interrogation." Accordingly, the Court finds Defendant has waived this argument.

reasonable suspicion." United States v. Lowe, 791 F.3d 424, 432 n.4 (3d Cir. 2015) (citations omitted).

## IV. DISCUSSION AND CONCLUSIONS OF LAW

### A. Probable Cause to Detain Defendant

Defendant argues that the traffic stop was unlawful because it was "prolonged beyond the time reasonably required to complete [the] mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005); see also Rodriguez v. United States, 575 U.S. 348, 355 (2015). In his opening brief, Defendant argues that though there was arguably probable cause for Officer Simcox to initially stop Defendant, once Defendant presented his license and registration to Officer Simcox, Officer Simcox completed the stop. Defendant contends that he should have been free to leave, so there was no reasonable suspicion that justified detaining Defendant while the officers waited for a canine unit. Defendant argues because Defendant was not within reaching distance of the vehicle at the time he was detained, in light of Arizona v. Gant, 556 U.S. 332 (2009), the officers violated his Fourth Amendment Rights when they searched his vehicle.

The Government does not contest that the officers detained Defendant and seized the items in the duffel bag. Instead, the Government argues that the officers had probable cause to stop and detain Defendant and to search Defendant's vehicle.

13

"Generally, for a search or seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based upon probable cause." United States v. Bey, 911 F.3d 139, 144-45 (3d Cir. 2018) (citing United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006)). "Warrantless searches and seizures are presumptively unreasonable unless the Government satisfies its burden of establishing that one of the exceptions to the warrant requirement applies." Id. (citing California v. Acevedo, 500 U.S. 565, 580 (1991)).

One such exception permits police to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot," a so-called "Terry" stop. Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). "[T]o lawfully detain someone under Terry—even briefly—the Government must establish by a preponderance of the evidence that 'each individual act constituting a search or seizure' was reasonable. More specifically, each aspect of the detention must be justified by a reasonable suspicion." Bey, 911 F.3d at 145 (quoting United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005)). In evaluating reasonable suspicion, a court "must consider 'the totality of the circumstances—the whole picture.'" United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000) (quoting United States v. Sokolow, 490 U.S. 1, 8 (1989)).

14

As noted, Defendant argues that the officers did not have reasonable suspicion or probable cause to continue to detain Defendant after Defendant provided Officer Simcox with his license and registration. A detention that goes beyond the scope of a Terry stop may be justified if the arresting officer had "probable cause to believe that a crime was committed." Kolender v. Lawson, 461 U.S. 352, 365 (1983) (Brennan, J. concurring); see also United States v. Pitts, 497 F. App'x 252, 255 n.2 (3d Cir. 2012) ("Because we hold that the officers had probable cause to arrest [the defendant], we need not consider whether police detained him for longer than necessary."). Thus, a stop is constitutional if the evidence "demonstrates that probable cause indeed existed before [the] search went beyond the bounds of Terry." United States v. Yamba, 506 F.3d 251, 260 (3d Cir. 2007).

"Probable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves" to justify a reasonable person's belief that an offense has been or is being committed. Brinegar v. United States, 338 U.S. 160, 175-76 (1949) (citation omitted). Probable cause requires more than mere suspicion, but less than the evidence needed to convict. See United States v. Margeson, 259 F. Supp. 256, 263 (E.D. Pa. 1966).

The Government argues that in considering the collective investigation, the Government had sufficient probable cause to stop and detain Defendant while the officers waited for the canine unit. The Government avers that "[t]he collective knowledge of the investigating officers is measured in determining probable cause." U.S. v. Belle, 593 F.2d 487, 497 n.15 (3d Cir. 1979); see also Morrison v. Schultz, 270 F. App'x 111, 117 n.6 (3d Cir. 2008). "In order to determine whether the collective knowledge of police officers is sufficient to establish probable cause, there must be evidence that the police officers were either (1) cooperating in an investigation; or (2) there was communication between the officers." O'Connor v. City of Philadelphia, 233 F. App'x 161, 165 (3d Cir. 2007). When "law enforcement officers are cooperating in an investigation, as here, the knowledge of one is presumed shared by all." Illinois v. Andreas, 463 U.S. 765, 771 n.5 (1983).

Here, Officer Simcox testified that he was notified by Officer Jim Nolan that an HSI investigation was ongoing. Officer Simcox was informed that they possibly wanted a traffic stop done on a vehicle if the individual they were surveilling got in the Chevrolet Malibu. Tr. 286:11-20; 288:8-10. Officer Simcox then drove to the relevant location and Officer Nolan advised Officer Simcox to make the traffic stop. As a result, Officer Simcox became a part of the investigation. During the course of

16

the traffic stop, Officer Simcox remained in communication with the other officers. The Court finds that Officer Simcox shared in the collective knowledge of the officers that had been investigating Defendant's actions.

The Government argues that the officers had probable cause to stop and detain Defendant and to search his vehicle because Defendant ordered over a kilogram of Xylazine. The Government also argues that the totality of the circumstances supports a finding that the officers had probable cause. The Government's argument will be discussed further below.

### 1.   Xylazine and Probable Cause

First, the Government argues that the fact that Defendant ordered over a kilogram of Xylazine is probable cause sufficient to justify detaining Defendant. The Government notes that it does not matter "if law enforcement arrest a suspect for a different crime than the one supported by probable cause so long as there was an objective basis for the arrest." Gov. Mem. of Law ¶ 78, ECF No. 47-1. The "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause" because "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the

circumstances, viewed objectively, justify that action."
Devenpeck v. Alford, 543 U.S. 146, 143 (2004) (internal citation
and quotation marks omitted).

Defendant contends that the mere possession of Xylazine is
not sufficient for a finding of reasonable suspicion or probable
cause. Specifically, Defendant avers that because Xylazine is
not considered a controlled substance, the Court cannot find
that Defendant's possession, or constructive possession, of
Xylazine supports a finding of probable cause.[7]

In response, the Government points to recent publications
that report on Xylazine's potency and the frequency with which
it is used as a drug adulterant. The Drug Enforcement
Administration and the FBI have put out warnings regarding
Xylazine's use in narcotics. See Xylazine, Drug Enforcement
Administration: Diversion Control Division (Feb. 2021),
deadiversion.usdoj.gov/drug_chem_info/Xylazine.pdf. The
Philadelphia Department of Public Health has also released a
report explaining that Xylazine has been detected in the illicit
drug supply in Philadelphia. See Stella C. Wong et al.,
Concurrent Detection of Heroin, Fentanyl, and Xylazine in Seven

---

[7]     The Court also recognizes that though the Code of Federal
Regulations of the FDA provides that Xylazine is restricted "to
use by or on the order of a licensed veterinarian," 21 C.F.R. §
522.2662(c), Xylazine is not classified as a controlled
substance.

Drug-related Deaths Reported from the Philadelphia Medical
Examiner's Office, 53 J. Forensic Science 495 (2008); Jewell
Johnson et al., Increasing Presence of Xylazine in Heroin and/or
Fentanyl Deaths, Philadelphia, Pennsylvania, 2010-2019,
27 Injury Prevention 395 (2021). The presence of Xylazine in
illicit drugs in Philadelphia has been reported since 2006. See
Wong, Concurrent Detection of Heroin, Fentanyl, and Xylazine,
supra, at 495. According to the Philadelphia Department of
Health, the presence of Xylazine in heroin and/or fentanyl
related deaths in Philadelphia has increased from 2% between
2010 and 2015 to 31% in 2019. See Johnson, Increasing Presence
of Xylazine, supra, at 395.[8] During the hearing, CBP Officer
Smith, Officer Vaccaro, and Special Agent Consavage testified
that though Xylazine is not a controlled substance, it is
considered a drug adulterant. Tr. 40:17-20; 196:13-16; 199:5-10;
236:19-21.

The Government contends that because Xylazine is frequently
used as a "drug adulterant," or "cutting agent," it qualifies as
"drug paraphernalia" pursuant to 21 § U.S.C. 863(d). The

---

[8]    The Government also points to several other publications
regarding increased reports of Xylazine in fatal drug overdoses.
In 2018, the Maryland Office of the Chief Medical Examiner found
over a 300% increase in drug overdoses caused by Xylazine. See,
e.g., Xylazine, Maryland Poison Center: University of Maryland
School of Pharmacy, (Jan. 2019)
https://www.mdpoison.com/media/SOP/mdpoisoncom/ToxTidbits/2019/J
an%202019%20ToxTidbits.pdf.

definition of "drug paraphernalia" includes "any equipment, product, or material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance, possession of which is unlawful under this subchapter." 21 § U.S.C. 863(d). The term "drug paraphernalia" may include substances used as diluents or cutting agents. See, e.g., United States v. Whitner, 219 F.3d 289, 292-93 (3d Cir. 2000) (noting that the officers recovered drug paraphernalia, including cutting agents); U.S. v. Arzola, 360 F. App'x 287, 288 (3d Cir. 2010) (noting that the evidence seized included "drug paraphernalia such as cutting agents"); United States v. Goode, No. 19-218-9, 2020 WL 2474429, at *2 n.6 (E.D. Pa. May 13, 2020) (same). The Government avers that because Defendant ordered and constructively possessed Xylazine,[9] the Court may find that the officers had probable cause. See, e.g., Young v. Cty. of Chester Pa., 764 F. App'x 262, 264 (3d

_____

[9]     The Court notes that the officers swapped the Xylazine with a replica substance. However, constructive possession "requires an individual to have the power and intent to exercise both dominion and control over the object he or she is charged with possessing." United States v. Iglesias, 535 F.3d 150, 156 (3d Cir.2008) (citation omitted); see also U.S. v. Smith, 352 F. App'x 709, 713 (3d Cir. 2009) (noting the same). Here, Defendant would have possessed the substance if it were not for the officers' intervention. Thus, the evidence supports that Defendant constructively possessed the Xylazine.

Cir. 2019) (noting that an officer's belief that a criminal
defendant possessed drug paraphernalia was sufficient to support
a finding of probable cause).

The Court notes that there is a dearth of caselaw on the
issue of whether Xylazine qualifies as "drug paraphernalia."
Regardless, as the weight of the evidence supports that Xylazine
is frequently used as a diluent or cutting agent, the Court
finds it falls within the definition of "drug paraphernalia"
pursuant to 21 § U.S.C. 863(d). Additionally, Defendant has not
offered an explanation as to why Defendant ordered the Xylazine,
and Defendant has not argued that Defendant sought to possess
Xylazine for a legal use. Thus, the officers had sufficient
probable cause to stop and detain Defendant.

Even if the Court were to find that this alone is
insufficient to support a finding of probable cause, the
totality of the circumstances, as explained below, supports a
finding that the Government had probable cause to detain
Defendant. See Maryland v. Pringle, 540 U.S. 366, 371 (2003)
("The probable-cause standard is incapable of precise definition
or quantification into percentages because it deals with
probabilities and depends on the totality of the
circumstance.").

2. <u>Totality of the Circumstances Support a Finding</u>
<u>Probable Cause Existed</u>

The Government points to additional circumstances that
support a finding of probable cause. First, the Government
points to the fact that Defendant ordered the Xylazine under a
false name ("Justin Sellers"), from China, with a mislabeled
customs declaration. Officer Vaccaro testified that individuals
may use fake names to conceal their true identity and evade
government inspection. <u>See</u> Tr. 197:15-25: 198:1-10.
Additionally, the record shows that Defendant had the package
shipped to a high-crime area. The Court may minimally weigh the
location of the stop when considering the totality of the
circumstances. <u>See United States v. Baley</u>, 505 F. Supp. 3d 481,
498 (E.D. Pa. 2020) ("[T]he location of the stop in a high-crime
area is a relevant factor to probable cause" but the court may
only give it minimal weight); <u>see also, e.g.</u>, <u>Dixon v.</u>
<u>Schweizer</u>, No. 18-5403, 2020 WL 4600187, at *7 (E.D. Pa. Aug.
11, 2020) (explaining that while presence in a high crime area
alone is insufficient to establish probable cause, it is
"relevant to the probable cause calculus"). The Court finds that
this provides additional evidence that the Government had
probable cause to detain Defendant.

The Government also points to Defendant's and Ms. Boykin's
actions that the Government avers were taken as
countersurveillance measures to avoid police detection. The

undercover officers witnessed Ms. Boykin and Defendant exit the residence at 1349 Kerbaugh Street and enter the Chevrolet Malibu, but minutes later Defendant exited the vehicle and re-entered the residence. Ms. Boykin subsequently drove away from the 1349 Kerbaugh Street in the Chevrolet Malibu and circled the block twice while purportedly peering into Officer Vaccaro's vehicle. Next, Ms. Boykin drove to a convenience store, while Defendant exited the back door of the Kerbaugh Street residence with a black duffel bag. Defendant then walked through an overgrown back alley and met Ms. Boykin at the convenience store.

Officer Vaccaro, Officer Nolan, and Special Agent Consavage testified that they believed these were "countersurveillance" measures used to avoid detection. Tr: 210:6-25; 211:1-13; 160:1-15; 252:9-22; 214:1-25; 215:1-5. The Government argues that these countersurveillance tactics may support a finding of probable cause. See, e.g., U.S. v. Frost, 999 F. 2d 737, 743 (3d Cir. 1993) (use of countersurveillance can support a finding of probable cause); United States v. Iafelice, 978 F.2d 92, 95 (3d Cir. 1992) (noting countersurveillance tactics may support an inference of criminal activity).[10] The Government contends that

---

[10]   The Government relies on States v. Mathurin, 561 F.3d 177-78 (3d Cir. 2009), for support that two suspected individuals leaving from separate exists supports a finding that the defendant was engaged in countersurveillance activity. This

"though the defendant left the residence some hours later and
with a different container (duffel bag) than the parcel he
brought, the circumstances indicate this bag contained evidence
of drug trafficking." Gov. Mem. of Law at 16, ECF No. 47-1.
After viewing the record, the Court credits this account and
finds that the countersurveillance tactics described by the
officers support a finding of probable cause.

The Government also points to occurrences during the
traffic stop itself to support a finding of probable cause. For
example, when Officer Simcox ran Defendant's license, Officer
Simcox learned that Defendant had multiple prior convictions for
drug-related charges. The Third Circuit has found that "the use
of prior arrests and convictions to aid in establishing probable
cause is not only permissible, but is often helpful" and the
"utility is enhanced when the prior offenses relate to the crime
being investigated." United States v. Green, 897 F.3d 173, 187
(3d Cir. 2018) (citing United States v. Conley, 4 F.3d 1200,
1207 (3d Cir. 1993)).

Additionally, Defendant misrepresented his criminal
history when Officer Simcox first asked if Defendant had any
prior arrests. The Court agrees with the Government that this is
further evidence of Defendant's attempts to deceive the

case, however, found that this supported a finding of reasonable
suspicion rather than probable cause.

officers. See, e.g., United States v. Whitner, 219 F.3d 289, 299

(3d Cir. 2000) (explaining that suspicious and deceptive

responses may lead to a reasonable inference that the defendant

was attempting to conceal evidence). Further, Defendant and Ms.

Boykin had inconsistent stories about where they were driving

from. Defendant told Officer Simcox that he was coming from

their house on Jerome Street, while Ms. Boykin stated that she

left Kerbaugh Street and picked up Defendant at his house on

Jerome Street. Here, Defendant's inconsistent story and

"puzzling responses provided a reasonable basis to believe that

[defendant] was lying about his travels," which supports a

finding of probable cause. Green, 897 F.3d at 186.[11]

---

[11]    The Government contends that in light of the aforementioned
actions, the Government had probable cause to detain Defendant.
The Government clarifies that there was probable cause that
Defendant violated customs laws regulating false statements on
labels on imported goods in violation of 18 U.S.C. § 542, and
that he knowingly imported drug paraphernalia in violation of 21
U.S.C. § 863(a)(2)-(3) and 18 U.S.C. § 545. Additionally, the
Government avers that there was probable cause that Defendant
was engaged in the manufacture, distribution, and possession
with the intent to distribute controlled substances in violation
of 21 U.S.C. § 841(a) and Pa. Const. Stat. § 780-113(a)(30).
Further, there was probable cause that defendant attempted to
aid and abet, or conspire to manufacture narcotics in violation
of state and federal laws, and that Defendant was violating
Pennsylvania state law for the delivery of "drug paraphernalia"
pursuant to 35 Pa. Const. Stat. § 780(a)(32)-(33).
    As the Government notes, they did not initially arrest
Defendant for the aforementioned violations. However, what the
Government intended to, or actually arrested Defendant for, is
irrelevant to the probable cause analysis. See Vanderklok v.
United States, 140 F. Supp. 3d 373, 382 (E.D. Pa. 2015) ("The
crime for which a suspect is eventually charged is irrelevant to

When considering the totality of the circumstances, including the Defendant's constructive possession of a kilogram of Xylazine, the mislabeling of the package, the countersurveillance tactics, Defendant's dishonesty at the traffic stop, and the fact that the activity took place in a high crime area, the Court finds that the totality of the circumstances supports a finding of probable cause. Thus, the officers did not violate Defendant's Fourth Amendment rights when they detained Defendant at the traffic stop, and so any physical evidence collected is not fruit of the poisonous tree.

### B.  <u>Probable Cause to Search the Vehicle</u>

Defendant also argues that in light of <u>Arizona v. Gant</u>, 556 U.S. 332 (2009), the officers violated Defendant's Fourth Amendment rights when they searched his vehicle. In <u>Gant</u>, the Supreme Court held that "police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search <u>or it is reasonable to believe the vehicle contains evidence of the offense of arrest</u>." <u>Id.</u> at 350 (emphasis added).

---

the probable cause analysis.") (citing <u>Barna v. City Of Perth Amboy</u>, 42 F.3d 809, 819 (3d Cir. 1994)). "Probable cause 'does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" <u>Id.</u> (citing <u>Adams v. Williams</u>, 407 U.S. 143, 149 (1972)).

Defendant argues that he could not have reasonably accessed the car while he was detained, so the officers violated his rights. However, the Supreme Court also explained that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity," this "authorizes a search of any area of the vehicle in which the evidence might be found." Id. at 347 (internal citation omitted); see also United States v. Burton, 288 F.3d 91, 103 (3d Cir. 2002) (to find probable cause to search a vehicle without a warrant, "there needs to be a 'fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Defendant argues that the officers did not have a reasonable belief that evidence of an offense would be found in Defendant's car. In response, the Government contends that the existence of probable cause to detain Defendant forecloses any argument that the officers did not have probable cause to search the vehicle. For the same reasons noted above, in considering the totality of the circumstances, the Court finds that the Government had probable cause to believe Defendant's Chevrolet Malibu contained evidence of criminal activity.[12] Thus, the

---

[12]    As noted, the canine unit also identified controlled substances in the vehicle, which later provided independent probable cause for the search.

officers did not violate Defendant's Fourth Amendment rights when they searched Defendant's vehicle.

**V. CONCLUSION**

For the foregoing reasons, the Court credits the Government's account and finds that the Government had probable cause to detain Defendant and to search his vehicle. Accordingly, Defendant's motion will be denied. An appropriate order follows.